COURT OF APPEALS OF VIRGINIA

Present:   Judges Petty, Alston and Senior Judge Willis
Argued at Richmond, Virginia


EUGENE SMITH THOMPSON

                                                    MEMORANDUM OPINION[*] BY
v.        Record No. 1732-09-2                    JUDGE JERE M.H. WILLIS, JR.
                                                          JULY 6, 2010
COMMONWEALTH OF VIRGINIA


FROM THE CIRCUIT COURT OF DINWIDDIE COUNTY
Thomas V. Warren, Judge

Linwood T. Wells, III, for appellant.

John W. Blanton, Assistant Attorney General (Kenneth T.
Cuccinelli, II, Attorney General, on brief), for appellee.


On appeal from his conviction of operating a motor vehicle while under the influence of

alcohol, a second or subsequent offense, in violation of Code § 18.2-266, Eugene Smith Thompson

contends the trial court erred in finding the evidence sufficient to prove he drove or operated the

vehicle in which the police found him.  We affirm the judgment of the trial court.

Background

"On appeal, 'we review the evidence in the light most favorable to the Commonwealth,

granting to it all reasonable inferences fairly deducible therefrom.'" Archer v. Commonwealth,

26 Va. App. 1, 11, 492 S.E.2d 826, 831 (1997) (quoting Martin v. Commonwealth, 4 Va. App.

438, 443, 358 S.E.2d 415, 418 (1987)).

Deputy Sheriff Nathaniel Charles, III, testified that around 10:00 p.m. on October 27,

2008, "we had a call of a vehicle traveling west in eastbound lanes [of Route 460]."  About

_____

[*] Pursuant to Code § 17.1-413, this opinion is not designated for publication.

fifteen minutes after receiving the call, Charles arrived "[o]ne and a half miles west of Baltimore Road" and saw a "vehicle facing west and in the eastbound lane." Thompson was seated behind the wheel. He appeared sluggish, and Charles detected a strong odor of alcohol. The vehicle's engine was off, the keys were not in the ignition, and there was damage to the front of the vehicle. Charles saw beer cans and debris inside the vehicle. Thompson said he was all right. When asked how far off the roadway the vehicle was located, Charles stated, "[I]t was in the [grass] median probably maybe 30, 40 feet off of the highway."

Trooper Christopher Ryan Garrett arrived a short time later and took charge of the investigation. He stated Thompson's vehicle was "sitting eastbound in the westbound lane" and Thompson was "behind the driver's seat, no seat belt on, passed out." Garrett testified that

> the car['s] headlights [were] turned on. The ignition keys, we couldn't find them. The engine was not on. Upon questioning Mr. Thompson he stated that he was leaving a buddy's house traveling to the town of Crew[e]. He further stated that he had had 17,000 beers to drink that evening and he had not had anything to drink since I came into contact with him.

Thompson had a strong odor of alcohol about his person, stumbled, swayed, and exhibited slurred speech. Due to his condition, he was unable to perform any field sobriety tests. Asked about Thompson's statements, Garrett said:

> He had stated again that he was traveling to meet up with friends in the town of Crew[e] coming from a buddy's house. Observed I believe it was eight or nine beer bottles empty in the vehicle. Again the car was off of the roadway.

The Commonwealth's attorney asked if Thompson said anything about oncoming traffic, and Garrett responded, "He did say when I questioned him why he had pulled over he had admitted that he was scared. He saw lights coming from oncoming traffic."

Thompson's sister, Mary Bullock, testified that she received a call from her brother's fiancé, Sheila Coryea, around 8:00 p.m. asking her to drive to a local business and help her with

Thompson, who was intoxicated and uncooperative. She said she and Coryea succeeded in getting Thompson into his vehicle, which Coryea drove. Bullock followed Thompson's car as Coryea tried to take him to a friend's house. Bullock testified as follows:

> [W]e come to a stop sign. It was on 460. I saw the sign. It was going - - [Coryea] turned to the right . . . and then she went up the road about four miles I guess it was. Then she turned back to the left going to a secondary road. She went up that road I guess about a mile or so and then she turned around. And I could see commotion. I turned around, too. I saw commotion in the car before they got to the stop sign right there at back on 460 [sic].
> [Thompson] had opened up the door on the passenger side and it was like he was trying to get out. And then the door closed again and I noticed that [Coryea] was going to the left. And she went up like going towards west going up on 460. And it was in the wrong lane, and then I come across.

According to Bullock, Coryea stopped the car where police later found it, ran over to Bullock's car and said, "'I can't stand it no more . . . I have to get away.'" Coryea said the best thing was just to leave Thompson there, and she entered Bullock's car. Bullock testified that she also told Coryea "the best thing is just to let him you know sleep it off where we can go find somebody." They agreed and "went up the road about four or five miles . . . up toward it was 460 West." They looked for a service station to call 911, but did not find one. Bullock said she then turned around, traveled east on Route 460, found a service station, pulled in, "and [Coryea] was going to go in."

> And about that time I [(Bullock)] saw some lights going by and I said, Sheila, I said maybe that is the police that is going up there to check on him. So we went by and when we did we went straight by and then we saw. We turned around to the left. We were going [on] 460 and saw the police that was on the side of the road. And I said I'm exhausted and tired. I have to go to work in the morning before 7:00. I said the best thing is to call in the morning. I said you need to go home because you can't talk to him, and I said if he sees you he is going to get really worse than what he is and he may start cursing and fighting and doing much worse than what he is. I was tired. I said it is time to go.

Bullock said she did not stop and speak with the police because she "knew" Thompson "would be in worse shape. I mean he might start cursing if he saw [Coryea] because he was already outrageous."

Coryea testified that Thompson was heavily intoxicated that evening and wanted to visit a friend's house, so she agreed to drive him there. After she bought Thompson beer, he became unmanageable, so she called Bullock to help her. Coryea said she asked Bullock to "follow me, let's just get him, you know, get him to his friend's, leave him there, and take me back home." While she was trying to find the friend's house, Thompson became disruptive, causing Coryea to turn into and drive in the wrong lane of travel on Route 460. She pulled into the grassy median as soon as she realized her mistake. She "turned the car off, grabbed the keys, took [her] purse and headed across into the grass," leaving Thompson alone in the passenger seat of his car. She got into Bullock's car. Coryea claimed her cell phone "had died," so they drove up and down Route 460 "looking for someplace to make a phone call." Coryea said she had nothing to drink that night and she never let Thompson drive the car. When asked why she did not stop when she saw the police confront Thompson, Coryea replied, she "was scared" because she was driving the car. When pressed further, Coryea explained she was scared because "I could have hit someone" driving the wrong way. On redirect examination, Coryea added she did not stop because she was afraid she would get charged with driving in the wrong direction. When asked if she has ever told the authorities this account, Coryea said she has not because she "thought since [she] had the keys" and Thompson was a passenger, he "wouldn't be charged."

Thompson testified and recalled being heavily intoxicated at the store with Coryea. The next thing he remembered was waking up in jail after his arrest. When asked if he recalled speaking with the officers, Thompson said, "It seems like I remember pieces of something, but no, sir, not exactly."

- 4 -

After hearing evidence and argument, the trial court found the testimony of Bullock and Coryea incredible and determined that the circumstantial evidence proved Thompson had driven the car and was guilty of driving while under the influence of alcohol.

Analysis

Thompson challenges the sufficiency of the evidence to support his conviction. He asserts "it was never proved that he either drove or operated the vehicle." He argues that the Commonwealth never established that he operated the vehicle and that he established through two "unimpeached witnesses" that someone else was driving.

When faced with a challenge to the sufficiency of the evidence, we "'presume the judgment of the trial court to be correct' and reverse only if the trial court's decision is 'plainly wrong or without evidence' to support it." Kelly v. Commonwealth, 41 Va. App. 250, 257, 584 S.E.2d 444, 447 (2003) (*en banc*) (quoting Davis v. Commonwealth, 39 Va. App. 96, 99, 570 S.E.2d 875, 876-77 (2002)). A reviewing court does not "ask itself whether *it* believes that the evidence at the trial established guilt beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 318-19 (1979). We ask only whether "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Kelly, 41 Va. App. at 257, 584 S.E.2d at 447. "'This familiar standard gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts.'" Id. at 257-58, 584 S.E.2d at 447 (quoting Jackson, 443 U.S. at 319).

Many of the cases upon which Thompson relies involve situations in which the defendant was deemed to be "operating" merely because he or she was present behind the wheel of a parked or stopped vehicle. See, e.g., Nicolls v. Commonwealth, 212 Va. 257, 184 S.E.2d 9 (1971); Gallagher v. Commonwealth, 205 Va. 666, 139 S.E.2d 37 (1964); Keesee v.

- 5 -

Commonwealth, 32 Va. App. 263, 527 S.E.2d 473 (2000); Leake v. Commonwealth, 27 Va. App. 101, 497 S.E.2d 522 (1998); Propst v. Commonwealth, 24 Va. App. 791, 485 S.E.2d 657 (1997). Here, however, the trial court relied upon its finding that Thompson operated the vehicle before pulling it onto the median, rather than merely upon the fact that he was seated behind the wheel of the car with its lights on and no key in the ignition.

In Lyons v. Petersburg, 221 Va. 10, 11, 266 S.E.2d 880, 880 (1980), an officer came upon an accident in which Lyons' car had hit a parked vehicle. Lyons was seated in the driver's seat. Id. He admitted drinking earlier but made no statements about the accident. Id. at 11-12, 266 S.E.2d at 880-81. Although "there were no witnesses testifying that [Lyons] was actually seen driving his vehicle," the Virginia Supreme Court explained that "[c]ircumstantial evidence is sufficient to convict if it excludes every reasonable hypothesis of innocence." Id. at 12-13, 266 S.E.2d at 881 (pointing out and citing several cases upholding convictions for operating a vehicle despite the absence of an eyewitness to such operation). Finding no reasonable, alternative explanation for Lyons' presence in his own wrecked car late at night, the Court held that it could be properly "inferred that Mr. Lyons' car was where it was at the time because he drove it there, and that the accident between his vehicle and the [parked car] occurred at a time when Lyons was in actual physical control of and operating his own vehicle." Id. at 13, 266 S.E.2d at 881.

Here, the circumstantial evidence points ineluctably to the conclusion that Thompson operated the car. The police found him alone, heavily intoxicated, behind the wheel of his own car minutes after a report that the car was traveling in the wrong lane of traffic. The scene was deserted. No one else was around. Thompson admitted he was traveling to Crewe, and he further stated he pulled off the road because the lights from coming traffic frightened him.

Notwithstanding the foregoing evidence, Thompson contends the testimony from his two witnesses was neither impeached nor contradicted, that it rebutted and disproved the Commonwealth's theory that he operated the car.

> While a jury, or a judge trying a case without a jury, are the judges of the weight of the testimony and the credibility of witnesses, they may not arbitrarily disregard uncontradicted evidence of unimpeached witnesses *which is not inherently incredible and not inconsistent with the facts appearing in the record*, even though such witnesses are interested in the outcome of the case.

Hodge v. American Family Life Assurance Co., 213 Va. 30, 31, 189 S.E.2d 351, 353 (1972) (emphasis added).

Thompson fails to acknowledge the trial court's role, as fact finder, and the requirement that the witnesses' testimony, although uncontradicted, also be credible. Bullock and Coryea were impeached by the showing of their bias and by the implausibility of their accounts. After hearing their testimony that they left Thompson in a severely drunken state unattended in the median of a highway, never advised anyone of this fact, and drove past the scene without giving information or assistance, and having considered their demeanor, the trial court found their testimony incredible.

The evidence, taken as a whole, sufficiently supports the trial court's finding that Thompson drove the car while under the influence of alcohol. Accordingly, we affirm the judgment of the trial court.

Affirmed.